IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

## STATE OF TENNESSEE  v. JAMES CONRAD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-04362     Joseph B. Dailey, Judge**

---

**No. W1999-00650-CCA-R3-CD - Decided June 28, 2000**

---

The defendant appeals from his conviction of extortion which arose from his activities as a "free lance bounty hunter." Because we find that the evidence was sufficient to support the conviction and that consecutive sentencing was mandatory for the defendant, who committed a felony while on parole for a felony, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the trial court is AFFIRMED.**

WITT, J., delivered the opinion of the court, in which SMITH, J., and WEDEMEYER, J., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, James Conrad.

Paul G. Summers, Attorney General and Reporter, J. Ross Dyer, Assistant Attorney General, Nashville, Tennessee, William L. Gibbons, District Attorney General, Lee Coffee, Assistant District Attorney General, Memphis, Tennessee, for the appellee, State of Tennessee.

**OPINION**

The defendant, James Conrad, appeals his Shelby County Criminal Court jury conviction of extortion, a Class D felony, which resulted in a career offender sentence of twelve years to be served in confinement consecutively to sentences on  previous convictions.  In this appeal, the defendant challenges the sufficiency of the convicting evidence, the trial court's failure to grant the defendant's motion for judgment of acquittal, and the consecutive nature of the incarcerative sentence.  After hearing oral arguments and reviewing the record and the applicable law, we conclude that the first two issues are meritless because the evidence supports the jury's finding that the defendant extorted money from the victim, despite the defendant's claim that he was acting lawfully as a "bounty hunter" and claiming justified expenses for his services.  We further conclude that the consecutive sentence was not only authorized but was mandatory.  Accordingly, the trial court's judgment is affirmed.

In the light most favorable to the state, the evidence showed that on October 1, 1996 the defendant came to the residence of Stanley Grove to get Grove to help him locate and apprehend

Vincent Shelby. Grove characterized himself and the defendant as "free lance" bounty hunters. Shelby, twenty-nine years of age, had been released in May 1996 on a $10,000 bail bond to answer to a charge of motor vehicle habitual offending. Grove testified that the defendant told him that a capias had been issued for Shelby's apprehension, and as an accommodation to his friend Conrad, Grove accompanied the defendant to Shelby's place of employment.

After arriving at Shelby's job site, the defendant, who was armed with a nine millimeter pistol, accosted Shelby and informed him that the men were taking him into custody on the capias. The bounty hunters hand-cuffed Shelby and put him in the back seat of the defendant's car. Shelby testified that the defendant asked him if he could raise any money for the purpose of paying the defendant to release him. Shelby indicated that he could ask his mother, Mary Wright, the victim in the case. Shelby testified that Grove and the defendant left him in the car while they dined at a Krystal's restaurant for about an hour. Then, they drove Shelby to his and his mother's residence.

Present inside the residence were the victim, her elderly father, her seven-year-old daughter, and three young children who were friends of the victim's daughter. Ultimately, the defendant, Grove, and Shelby, who remained handcuffed, entered the residence where the defendant and the victim fell into a heated discussion after the defendant proposed that he would release Shelby if the victim would pay him $200 for his "expenses." The victim testified that she did not wish to pay any money to have Shelby released because "it wasn't like my son wasn't going nowhere he hadn't been before." The victim testified that the defendant became angry and abusive when she would not agree to pay the money. She testified that he threatened to arrest the victim for harboring a fugitive, pulled the pistol and waved it around the room, threatened to "f - - - this whole house up" and to kill everyone in the house, and slammed Shelby into the wall and penned him with his hand or arm on Shelby's neck. During the prolonged encounter in the residence the victim called her attorney, who advised her to call the police; however, the victim testified that she was scared and harried by the confusion around her, especially her concerns for the welfare of her agitated father, and did not call the police. She testified that she needed to "get [her father] out of the way and then [] had all these children running through the house at the same time." Responding to her father's pleading that unless she paid the money, she may never see her son again, she succumbed to the demand for payment of $200 and wrote a check in that amount payable to James Conrad, who by this time had placed Shelby back in Conrad's car and was preparing to surrender him into official custody.

The defendant refused to accept the check and demanded cash. The victim agreed to drive to an automatic teller machine at a nearby grocery store to obtain $200 in cash. The defendant, driving his car which also contained Grove and the still-handcuffed Shelby, followed the victim to the store. When the victim obtained the money, she handed it to Grove, who gave it to the defendant. At some point, Grove gave the victim a receipt for $200, upon which he signed his name fictitiously as Stanley Granderson. After receiving the $200, the defendant removed the handcuffs and released Shelby.

After the men released Shelby, the victim "smack[ed him] up side [his] head," drove

him home, and told him "to get [his] ass out of her car." She testified that she had refused to sign the May 1996 bail bond because she had determined that she "was not paying any more money to keep [Shelby] out of jail."

On the evening of October 1, 1996, after leaving the company of the defendant and Grove, the victim called the police. Her complaint led to charges which ultimately resulted in the extortion conviction.

At the defendant's trial, the state introduced a letter addressed to Grove which, by handwriting analysis, the state proved had been written by the defendant. In it, the defendant pleaded with Grove to "exonerate" the defendant from the charges. Grove, who also had charges pending against him from the October 1 incident, testified as a state witness. The defendant opted not to testify but did present two alibi witnesses who testified that the defendant was in Holly Springs, Mississippi, on October 1, 1996.

## I. Sufficiency of the Evidence.

We address as a single issue the defendant's claims that the evidence is insufficient to support the verdict and that the trial court erred in overruling his Tennessee Rule of Criminal Procedure 29 motion for judgment of acquittal. The standard for the trial court's determination of the Rule 29 claim is the same as the appellate court uses to review the sufficiency of the evidence. Tenn. R. Crim. P. 29(a); State v. Bush, 942 S.W.2d 489, 517 (Tenn. 1997) (appendix, excerpt of Court of Criminal Appeals opinion, Hayes, J.); State v. Adams, 916 471, 473 (Tenn. Crim. App. 1995).

When the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2782 (1979); Tenn R. App. P. 13. See also, State v. Williams, 657 S.W.2d 405 (Tenn. 1983). This rule applies to findings based on both direct and circumstantial evidence. State v. Thomas, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988). Circumstantial evidence alone may be sufficient to convict one of a crime. State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

It is well established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Townsend, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978).

Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, State v. Grace, 493 S.W. 2d 474, 476 (Tenn. 1973); Anglin v. State, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977), which the defendant has the burden of

overcoming. <u>State v. Brown</u>, 551 S.W.2d 329, 331 (Tenn. 1977).

For purposes of the present case, a person commits extortion who "uses coercion upon another person with the intent to . . . [o]btain property, services, [or] any advantage or immunity." Tenn. Code Ann. § 39-14-112(a) (1997). Our Code provides that:

> "Coercion" means a threat, however communicated, to:
> (A) Commit any offense;
> (B) Wrongfully accuse any person of any offense;
> (C) Expose any person to hatred, contempt or ridicule;
> (D) Harm the credit or business repute of any person; or
> (E) Take or withhold action as a public servant or cause a public
> servant to take or withhold action.

Tenn. Code Ann. § 39-11-106(a)(3) (1997).

Upon reviewing the transcript of the evidence, we are aware that the testimony of the state's witnesses includes various inconsistencies and contradictions. Nevertheless, as pointed out above, it is the jury's prerogative to resolve contradictions in the evidence, to weigh the evidence, and to resolve credibility issues. The record contains an adequate basis upon which a reasonable jury could find beyond a reasonable doubt that the defendant threatened to perform violent criminal acts in the victim's residence, with the intent to obtain money. The jury heard testimony that the defendant threatened to kill the people in the house and to "f- - - this whole house up" and that he, after assaulting Shelby, said, "You'll be lucky if you see your son again." Obviously, the jury accredited this testimony. We may not trespass upon the jury's province by drawing our own inferences from the evidence or by making credibility assessments different from those made by the jury.

During oral argument before this court, the defendant posited as a part of his insufficiency of the evidence claim that he was privileged to request and receive the $200 payment as reimbursement of his expenses in locating and apprehending Shelby. We inferred from his argument a claim that the bail bonding law made express provision for such expense claims.

Code section 40-11-301 defines and limits the activities of "professional" bondsmen. Tenn. Code Ann. § 40-11-301(a), (b) (1997); <u>see</u> <u>also</u> Tenn. Code Ann. § 40-11-126 (1997) (unprofessional conduct). The Code's regulation of professional bondsmen "extends to and includes the agents, representatives or employees of such professional [bondsmen], or those acting for [them], whether with or without compensation or salary." Tenn. Code Ann. § 40-11-301(d) (1997). Upon payment of a forfeiture of a criminal defendant's bond, the bondsman "may arrest the defendant on a certified copy of the capias, or may, by a written authority endorsed on such copy, authorize another person to make the arrest." Tenn. Code Ann. § 40-11-133(b) (1997). Bondsmen are prohibited from accepting anything "of value from a principal except the premium" and "collateral or security or other indemnity from the principal which shall be returned upon final termination of liability on the bond." Tenn. Code Ann. § 40-11-126(8) (1997). In the latter case, the bondsman

-4-

must provide a receipt for the collateral which describes the collateral and states the terms for redemption of the collateral.[1]

Having reviewed the applicable provisions of the bail bonding law, we find no provision which authorizes a bondsman or his agent to charge expenses to his principal. In addition to the bond premium, the bondsman may accept collateral, but the defendant's activities in procuring $200 from Ms. Wright on October 1, 1996 cannot reasonably be viewed as obtaining collateral or securing Shelby's bond. The defendant did not characterize the money in this manner, and the receipt -- even if it could be viewed as otherwise legitimate -- did not specify terms for the redemption of the collateral, as required by section 40-11-126(8). Thus, we discern no specific nor express authority for the defendant to assert that the $200 served as reimbursement for his expenses.

We are aware that Code section 39-14-112(b) establishes affirmative defenses to extortion when the accused "reasonably claim[s]: (1) Appropriate restitution or appropriate indemnification for harm done, or (2) Appropriate compensation for property or lawful services." Tenn. Code Ann. § 39-14-112(b) (1997). We have considered whether the defendant's claim for expense reimbursement avails him an affirmative defense, based upon some general theory of entitlement such as *quantum meruit.* However, on this basis as well, the defendant's claim fails. First, in order to rely upon an affirmative defense, a defendant must, "no later than ten (10) days before trial, notify the district attorney general in writing of the intention" to rely upon a specified affirmative defense, and he must "file a copy of the notice with the trial court clerk." Tenn. Code Ann. § 39-11-204(c), (d) (1997). The trial court clerk's technical record filed as part of the appellate record reflects no such filing. Second, to make out an affirmative defense to extortion, the defendant must have *reasonably* demanded an *appropriate* value for restitution, indemnification or compensation. See Tenn. Code Ann. § 39-14-112(b) (1997). Nothing in the record establishes the amount of any expense born by the defendant in apprehending Shelby, much less the appropriateness of any expense claim. Further, the method employed by the defendant in demanding the money

---

[1] The Code did not recognize "bounty hunters" as such until the enactment of section 40-11-318, effective May 18, 1998. That section defines a bounty hunter as "an agent of a professional bondsman who [,for a contingent fee,] attempts to or takes into custody a person who has failed to appear in court and whose bond has been forfeited." Tenn. Code Ann. § 40-11-318 (Supp. 1999). Under this section, persons convicted of felonies are disqualified to act as bounty hunters. Tenn. Code Ann. § 40-11-318(b) (Supp. 1999). A convicted felon who performs the services of a bounty hunter commits a Class A misdemeanor. Id.

The 1998 act governing the activities of bounty hunters obviously did not apply to the enterprise in which the defendant was engaged on October 1, 1996. As a convicted felon, the defendant would have been disqualified to act as a bounty hunter under the 1998 act. However, code section 40-11-128 prohibits convicted felons from acting as bondsmen or agents of bondsmen. Tenn. Code Ann. § 40-11-128 (1997). This code section does apply to the defendant and disqualifies him to act as either a bondsman or as an agent for one.

cannot be described as reasonable. He physically assaulted the victim's son in her presence and brandished a gun in her home. "The issue of the existence of an affirmative defense may not be submitted to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-204(d) (1997). Thus, we conclude that the record fails to show that an affirmative defense pursuant to section 39-14-112(b) was fairly raised.[2]

For the foregoing reasons, we conclude that the evidence is sufficient to support the conviction.

## II. Consecutive Sentencing.

Relying upon Tennessee Code Annotated section 40-35-155(b), which establishes guidelines for consecutive sentencing, the defendant asserts in his brief that the trial court erred in ordering the present sentence to be served consecutively to previous convictions of aggravated kidnapping and aggravated robbery. The state argues that Tennessee Rule of Criminal Procedure 32(c)(3) controls and *requires* consecutive sentencing.

There is no dispute that the defendant was on parole for the prior felony convictions when the extortion was committed on October 1, 1996. Rule 32(c)(3) provides for the mandatory consecutive service of a "sentence for a felony committed while on parole for a felony." Tenn. R. Crim. P. 32(c)(3)(A).

During oral argument, the defendant conceded, and we agree, that the state is

---

[2]To the extent that Code section 39-14-112(c)(2) establishes an affirmative defense to extortion when the defendant claims appropriate compensation for "lawful services," it is not clear that the defendant's bounty hunting "services" were lawful. A private citizen may effect an arrest for an offense not committed in his or her presence "when a felony has been committed, and the arresting person has reasonable cause to believe that the person arrested committed it." Tenn. Code Ann. § 40-7-109(a)(3) (1997). Even if the "citizen's arrest" statute may be applied in the present situation where the citizen knows about a capias issued against the person arrested, the record in the present case establishes no basis for concluding that a felony had been committed or that Conrad had a reasonable basis for believing that Shelby committed it.

Apart from the citizen's arrest provision in section 39-14-112(c), section 40-11-133(b) allows a qualified bondsman, after a bond forfeiture, to authorize another person to arrest the principal, by a written endorsement "on a certified copy of the capias." This provision, however, is unavailing to the defendant because the record contains no copy of the capias and no written endorsement that authorized the defendant to arrest Shelby. Further, the defendant, as a convicted felon, is not qualified to act as a bondsman or as an agent for a bondsman. See TCA § 40-11-128 (1997).

Accordingly, the record fails to support the notion that the defendant's "services" were lawful.

correct. Consecutive sentencing was required by Rule 32(c)(3).

## III. Conclusion.

Finding no reversible error, we affirm the judgment of the trial court.