# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 5, 2002

## STATE OF TENNESSEE v. SHANNON LEE WOOD

### Appeal from the Circuit Court for Benton County
### No. 99-CR857    Julian P. Guinn, Judge

---

### No. W2000-01612-CCA-R3-CD - August 7, 2002

---

Following a jury trial, the defendant, Shannon Lee Wood, was convicted of the July 4, 1999 aggravated child abuse of his eighteen-month-old stepdaughter, for which he received a 20-year sentence as a violent offender.  Now on appeal, the defendant's sole issue is whether the convicting evidence is sufficient to support the conviction.  It is, and we affirm.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Louis W. Ringger, Jr. (at trial), Decaturville, Tennessee; and Guy T. Wilkerson (on appeal), Camden, Tennessee, for the Appellant, Shannon Lee Wood.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; G. Robert Radford, District Attorney General; and Beth Boswell, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Silver Rae Wood, the defendant's wife, testified that she was at their Big Sandy trailer home on July 4, 1999 with the defendant and her eighteen-month-old daughter, R. T.[1]  R. T. was the defendant's stepdaughter; at the time, Ms. Wood was in the final month of pregnancy with the couple's only child.  During the afternoon, Ms. Wood had been out of the home five to ten minutes and "when [she] left the house everything was fine." When she returned, she found both the defendant and the child in the living room crying.  R. T. was "hysterical" and could not walk; her leg was swollen and she could not put weight on it.  Ms. Wood testified that the defendant "said that he had took [sic] [R. T.] in the bedroom to pick up her . . . toys and he got mad at her because she wouldn't.

---

[1]We decline to identify by name the minor victims of child abuse.

So he threw her on the ground to make her pick up her toys." The defendant said R. T. hurt her leg.

Ms. Wood testified that she urged the defendant to allow her to take the child to the hospital, offering to lie to hospital personnel about the cause of the injury, but he refused and indicated that he was not going to jail for child abuse. "That's when he started getting all mad at me. He was saying he was going to kill us, that he would rather go to jail for murder." She and the defendant fought, and he threatened her with a loaded shotgun.[2] She testified that, later in the evening, he took Ms. Wood and the child with him to his brother Shane's house and instructed Ms. Wood not to tell Shane or his wife, Buffy, what had happened to R. T. Ms. Wood testified that during the visit, the defendant retrieved his handgun from his brother. After a while, the defendant took Ms. Wood and R. T. back home, where R. T. slept throughout the night.

Ms. Wood testified that about 9:00 on the morning of July 5, 1999, the defendant left to take Shane Wood to Reagan, Tennessee to allow Shane to pick up his road tractor.[3] Immediately after he left, Ms. Wood called the Benton County Sheriff's Office and asked for help in taking her child to the hospital. Deputy Sheriff Clarence Lee Hassell arrived at the Wood home a few minutes later and transported Ms. Wood and R. T. to the hospital. Radiological tests revealed a nondisplaced fracture of R. T.'s left femur.[4]

In the afternoon of July 5, the defendant drove his Camaro to the sheriff's office to inquire about his wife, whereupon he was arrested for child abuse. Afterward, upon finding the Camaro parked at the sheriff's office, Silver Wood retrieved the trailer keys from inside the Camaro and found the defendant's shotgun in the back seat. She retrieved it and delivered it to Deputy Hassell.

Ms. Wood testified that at the time of trial, her divorce from the defendant was pending and that the defendant, who had made bond on or about September 17, 1999, had harrassed her in the weeks prior to his trial, causing her to move four times and change jobs three times. She testified that in the week prior to trial, her car had been stolen and vandalized and that she "had two

---

[2]Ms. Wood additionally testified that she was afraid of the defendant; he had "hurt [her] several times before [and] hit [her] with about anything he could get his hands on, [including] chains." She testified that he had previously beaten both R. T. and her. She had left him on previous occasions, including Christmas 1998 when she received help from a social agency in being placed into a housing project in Lexington. The defendant came to her apartment and said "that he was not going to leave [her and R. T.] alive and that either [Ms. Wood] was going to . . . come back home or he was going to kill them both right there." She left the housing project and returned home with the defendant.

[3]Both the defendant and Shane Wood were commercial truck drivers.

[4] The Department of Children's Services assumed custody of R. T., and a social agency facilitated Ms. Wood's placement in a shelter. After wearing a "body cast" for several weeks, R. T.'s injury healed, and she apparently recovered fully.

girls come up to [her] and [tell her] they was going to whop [sic] [her] ass and [she] was not going to be here to testify this week, that Shannon had paid them to have them whop [sic] [her] ass."

Deputy Hassell's trial testimony corroborated that Ms. Wood made the July 5 call to the sheriff's office and that he transported her and the child to the hospital, although he testified that she placed her call around 11:00 a.m., rather 9:00 a.m. At trial, he testified that when he arrived at the home, Ms. Wood was "shaking," "frantic[]," and "really frightened about being [at the trailer]." The child "wasn't acting like children usually do. She was just [lying] there." While at the trailer, he saw a shotgun in a living-room gun rack and identified it as the same shotgun that Ms. Wood retrieved from the Camaro and gave to him later that day after the defendant had been incarcerated.

The state offered expert medical evidence that R. T. had suffered a nondisplaced fracture to her left femur, that the fracture was the result of substantial force being applied, and that the fracture was consistent with someone throwing, dropping, or perhaps forcing the child onto the floor, but not consistent with twisting the leg.

Before testifying in his own defense, the defendant called his brother and sister-in-law, Shane and Buffy Wood, to testify about the visit of the defendant, Silver Wood, and R. T. to Shane and Buffy's house the evening of July 5, 1999. Shane and Buffy Wood were in general agreement that R. T.'s leg was injured. There being no discoloration of the leg and nothing indicating to them that the leg was broken, and believing that R. T. had suffered a sprain, Shane Wood suggested that the child be soaked in warm water and that Icy Hot be applied to her leg.[5] It was obvious to both Shane and Buffy Wood that something was wrong with R. T., and they testified that when they asked the defendant and Silver Wood what had happened to R. T., "they" replied that R. T. had fallen off a bed. Buffy Wood testified that both the defendant and Silver Wood were concerned about R. T. and were in a quandary about whether to take her to the hospital.

The defendant testified that, on the afternoon of July 4, 1999, he had been mowing the yard and had come into the trailer to drink ice water. Silver Wood and R. T. were inside. R. T. was apparently cranky because the defendant had not let her go outside to play, and he had taken her to her bedroom. He was alone in the bedroom with her, and prior to his touching her, she was limping. He decided he was going to take her outside. When she would not stop crying and would not pick up her sunglasses, he told her to sit down. When she would not, he knelt on the floor, raised her about a foot off the floor with both his hands being placed between her waist and armpits, and "sat [sic] her down on her butt." He testified that, in the process of setting her "on her butt," her left leg "went sideways." He admitted being somewhat forceful in his placement of the child on the floor but denied using excessive force.

The defendant denied that he refused to allow R. T. to be taken to the hospital and denied that he threatened Silver Wood with the shotgun or otherwise. He admitted that after he

---

[5]Shane Wood acknowledged that "[w]e're not no doctors, . . . we've just got five kids, you know."

returned from Reagan and found his wife and R. T. gone, he placed the shotgun in the Camaro, but he insisted he did so because he planned to raise money by pawning the weapon. He testified that the shotgun was not loaded and that he took no ammunition with him.[6]

Based upon this evidence, the jury convicted the defendant of aggravated child abuse, which is committed by one who knowingly treats a child under the age of 18 in such a manner as to inflict injury or neglects such child so as to adversely affect the child's health and welfare, when such treatment or neglect results in serious bodily injury to the child. Tenn. Code Ann. §§ 39-15-401(a), -402(a) (1997).[7] The defendant argues on appeal that the evidence is insufficient to support the conviction.

As an appellate court, we essentially view a different evidential mosaic than did the trier of fact. We see the same tesserae as did the trier of fact, but on appeal the full mosaic has been altered: Different hues emanate from the fact trier's inferences and credibility shadings, and from the appellate perspective of the overall image, we see in highlight the features most favorable to the state. *See State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978) (on appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom). Our critique of the image, thus highlighted, is aimed at determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 2782 (1979); Tenn. R. Crim. P. 13(e).

A jury's verdict of guilty removes the presumption of innocence and raises a presumption of guilt on appeal. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973); *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977). The jury's guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978); *State v. Townsend*, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the defendant has the burden of overcoming the presumption of guilt. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

Applying these principles of law, we hold that sufficient evidence supports the conviction. The elements of aggravated child abuse were supplied by the testimony of Silver Ward and the treating medical expert. We fully realize that other witnesses contradicted some aspects of Silver Wood's testimony and that the defendant denied treating the child in a "manner as to inflict injury." In identifying various points of conflicting evidence, however, the defendant merely justifies the need for the fact-finding crucible of a trial. As long as the fact finder heard evidence which logically established the elements of the conviction offense, as the jury did in this case, the factual

---

[6]Apparently, the gun was unloaded when found inside the Camaro, and no ammunition was found inside the car or on the defendant's person.

[7]The conviction offense was contained in count two of the indictment. The jury acquitted the defendant on count one, an allegation that the defendant abused R. T. in June 1999 by holding her underwater at a swimming hole during a family outing.

conflicts have been legally resolved, albeit against the defendant. In other words, he had "his day in court," and on appeal, we are powerless to disturb the jury's verdict, as a rational end-product of the trial process.

_____
JAMES CURWOOD WITT, JR., JUDGE